567 So.2d 943 (1990)
TURKEY CREEK, INC. a Florida Corporation, and Norwood W. Hope, Appellants,
v.
Javier H. LONDONO, M.D., Charles A. Williams, Jr., Esquire and John Hoce, Appellees.
No. 89-2123.
District Court of Appeal of Florida, First District.
September 12, 1990.
*944 Michael W. Jones of Michael W. Jones, P.A., Gainesville, for appellants.
John F. Roscow, III of Scruggs & Carmichael, P.A., Gainesville, for appellees.
NIMMONS, Judge.
Appellants challenge the trial court's rulings dismissing with prejudice all counts of their complaint.[1] We reverse as to all counts.
Appellant Turkey Creek is a Florida corporation whose primary business activity is development and sale of land in a planned unit development (PUD) known as Turkey Creek. The PUD is primarily residential in nature, and appellees are residents thereof. At the times material to this case, Turkey Creek owned a majority of the real property situated within the PUD. Appellant Norwood Hope is the president and majority shareholder of Turkey Creek, Inc. Turkey Creek operates its developments through homeowners' associations, each of which is governed by its "Declarations of Covenants, Conditions, and Restrictions," and its by-laws.
In late 1981 and early 1982, many dissatisfactions and disagreements developed between appellees and appellants regarding interpretation of the PUD's governing regulations and appellants' operation of the PUD. Appellees and other residents of the PUD met and communicated amongst themselves, and in January 1982 organized into an entity known as the "Turkey Creek Property Owners' Ad Hoc Committee."
In March 1982 appellees filed suit against appellants, seeking a declaratory judgment and damages in connection with the dispute over appellants' operation of the PUD. Appellants filed their answer in January 1984, and final judgment was entered for appellants in October 1984. Final judgment for costs was entered for appellants in March 1985.
Appellants subsequently brought suit against appellees for slander of title, malicious prosecution (for bringing the 1982 action referenced above), tortious interference with contractual rights, tortious interference with an advantageous business relationship, and conspiracy to interfere with appellants' contractual rights and business relationship. The action was based primarily upon allegations that, from early 1982 through May 1984, appellees publicly disseminated false assertions that land in the PUD was "in distress" and that title to appellant's property within the PUD was unmarketable and impaired. Among other things, appellees allegedly distributed this false information to local zoning officials with the result that rezoning sought by appellants was denied or delayed.
Turkey Creek alleged that it had a contractual relationship with Owens Illinois Development Corporation (OIDC), which afforded OIDC a series of options to purchase land within the project from appellant, with Turkey Creek receiving development rights for each property on which OIDC exercised an option. OIDC abandoned its relationship with appellants in May 1984, as a direct result of the complained of actions of appellees, which included the communication to OIDC of false information regarding appellants. The termination of this business relationship cost appellants an estimated $4,000,000 in expected future profits.
The trial court dismissed the slander of title claim on the ground that it is a compulsory counterclaim to the 1982 action. The court dismissed the malicious prosecution action on the ground that by obtaining a cost judgment in the earlier action appellants had elected their remedy and were therefore precluded from seeking further relief in a subsequent action. The court further found that the complaint failed to state a cause of action for tortious interference *945 with a contract and with an advantageous business relationship, and for civil conspiracy.[2]
The trial court erred in concluding that appellants' claim for slander of title was a compulsory counterclaim to appellees' earlier suit. Rule 1.170(a) states in part:
Compulsory Counterclaims. A pleading shall state as a counterclaim any claim which at the time of serving the pleading the pleader has against any opposing party, provided it arises out of the transaction or occurrence that is the subject matter of the opposing party's claim and does not require for its adjudication the presence of third parties over whom the court cannot acquire jurisdiction.
In Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926), the court stated:
Transaction is a word of flexible meaning. It may comprehend a series of many occurrences, depending not so much on the immediateness of their connection as upon their logical relationship.
Federal Rule 13(a) is virtually identical to Rule 1.170(a), and is read broadly by the federal courts. Pochiro v. Prudential Insurance Co. of America, 827 F.2d 1246, 1252-53 (9th Cir.1987). "It has been said that courts should give the phrase `transaction or occurrence that is the subject matter of the suit' a broad realistic interpretation in the interest of avoiding a multiplicity of suits." Stone v. Pembroke Lakes Trailer Park, Inc., 268 So.2d 400, 402 (Fla. 4th DCA 1972).
It has been suggested that a claim is a compulsory counterclaim if any of the following questions can be answered in the affirmative:
(1) Are the issues of fact and law raised by the claim and counterclaim largely the same?
(2) Would res judicata bar the subsequent suit on defendant's claim absent the compulsory counterclaim rule?
(3) Will substantially the same evidence support or refute plaintiff's claim as well as defendant's counterclaim?
(4) Is there any logical relation between the claim and the counterclaim?
City of Mascotte v. Florida Municipal Liability Self Insurers Program, 444 So.2d 965, 967 (Fla. 5th DCA 1983); Hilton Casinos, Inc. v. First National Bank of South Miami, 380 So.2d 1061, 1063 (Fla. 3d DCA 1980). The federal courts have used this test. 6 Wright & Miller, Federal Practice and Procedure § 1410, pp. 41 & 42; Roberts v. National School of Radio and Television Broadcasting, 374 F. Supp. 1266, 1270 (D.C.Ga. 1974).
In Neil v. South Florida Auto Painters, Inc., 397 So.2d 1160, 1164 n. 7 (Fla. 3d DCA 1981) the court questioned the utility and necessity of the first three tests, because to some extent they are redundant to concepts of collateral estoppel and res judicata and because, if the relationship between the original claim and the counterclaim satisfies any one of the first three tests, it necessarily satisfies the logical relationship test. In Neil, the court addressed the question of how to apply the logical relationship test where none of the first three tests applies to establish the claim's nature as a compulsory counterclaim. The court found that Neil's claim was a compulsory counterclaim even though the first three tests were not met because the claim and the original claim, both arising out of a single confrontation between the parties, were "inextricably bound." The court embraced the following test:
The test, in modern form, is set forth in Revere Copper and Brass, Inc. v. Aetna Casualty and Surety Co., 426 F.2d 709, 715 (5th Cir.1970):
"... a claim has a logical relationship to the original claim if it arises out of the same aggregate of operative facts *946 as the original claim in two senses: (1) that the same aggregate of operative facts serves as the basis of both claims; or (2) that the aggregate core of facts upon which the original claim rests activates additional legal rights in a party defendant that would otherwise remain dormant." (emphasis in original).
397 So.2d at 1164. The Neil court added that "stating the test is far easier than determining whether claims are or are not logically related." We agree.
Appellees' initial action against appellants concerned appellees' dissatisfaction with the manner in which appellants operated the PUD, and sought a declaration of the parties' rights and obligations under the by-laws of the PUD. Appellants' action against appellees, on the other hand, concerns numerous allegedly false statements made by appellees which were not directly connected with the declaratory judgment action.
With respect to the defamation claim as a possible compulsory counterclaim, the court stated in Pochiro that a defamation action may be barred as a compulsory counterclaim "[a]s long as the allegedly defamatory statements are sufficiently related to [the] subject matter of the original action ..." Id. at 1251. In Harris v. Steinem, 571 F.2d 119 (2d Cir.1978), Harris' 1975 suit against Steinem alleged fraud in connection with a 1972 stock sale, and Steinem's counterclaim alleged defamation based upon the suit and subsequent publicity.[3] The Second Circuit held that the counterclaim was not compulsory because the logical relationship between the initial claim and the counterclaim was "at best attenuated." Id. at 124. In coming to this conclusion, the court relied partially upon the fact that Steinem's defamation claim raised several new issues, such as Steinem's status as a "public figure," and whether the allegedly defamatory statements were privileged.
We find that it is pertinent, although not dispositive, that the original claim was sufficiently distinct from the present slander action that a favorable result for appellees in the first action would not be inconsistent with a verdict in favor of appellants in the slander action. In Pochiro, the court relied heavily upon the fact that should Prudential, the original plaintiff, prevail in the original action, the collateral estoppel effect of that result would preclude the defamation action. In Stone v. Pembroke Lakes Trailer Park, Inc., 268 So.2d 400, 402 (Fla. 4th DCA 1972) and the leading case of Moore v. New York Cotton Exchange, 270 U.S. 593, 610, 46 S.Ct. 367, 371, 70 L.Ed. 750 (1926) (quoted in Stone), the courts pointed out in finding the present suit to be a compulsory counterclaim that the latter suit needed only the failure of the first suit to establish a foundation therefor. In Harris, supra, the court found that the two claims were not logically related despite the court's suggestion that plaintiff Harris' success in the original claim would probably have defeated the counterclaim. Harris at 124.
We acknowledge appellees' point that both the present slander action and the previous declaratory judgment action arise from the ongoing disagreement between the parties resulting from appellees' dissatisfaction over appellants' management of the PUD, and that both the declaratory action and the slander of title claim refer to the "marketability" of land in Turkey Creek. It does not follow, however, that an action is a compulsory counterclaim simply because it is relevant to the earlier action.
The timing of the events in question is also significant. Rule 1.170(a) requires that compulsory counterclaims which have accrued by the time of the filing of the response must be raised in the original action. Appellees' declaratory action was filed in March 1982 and appellants' answer *947 was filed in January 1984. A cause of action for defamation accrues at the time of publication. Miceli v. Gilmac Developers, Inc., 467 So.2d 404 (Fla. 2d DCA 1985). The defamatory statements alleged in the instant case began in January 1982 and continued after the filing of the March 1982 complaint. In Harris, supra, the court acknowledged that Federal Rule 13(a) is to be "generously construed" but relied upon "the well-established narrow line of decisions involving counterclaims based solely on the filing of the main complaint and allegedly libelous publications thereafter." Id. at 125. In Pochiro the court distinguished Harris on the ground that some of the allegedly libelous statements in Pochiro had been made prior to the filing of the complaint, and pointed out that the fact that some of the statements may have been made after the filing of the complaint did not change the court's conclusion. 827 F.2d at 1251, n. 9.
Since a large portion of the defamatory statements in the instant case was apparently made prior to January 1984, the slander of title action had technically "accrued" by January 1984. The alleged damages, however, including the loss of $4,000,000 in anticipated profits resulting from the May 1984 loss of the contract with OIDC, and reduced home sales in the PUD through 1985, continued well beyond January 1984. Accordingly, while appellants could have asserted their slander of title claim in January 1984, they had reason not to do so because the damages had not yet fully materialized and were not yet fully ascertainable.
The purpose of the compulsory counterclaim rule is to minimize litigation by preventing a multiplicity of suits, and "to achieve a just resolution in a single lawsuit of all disputes arising out of common matters." Neil, 397 So.2d at 1164. As pointed out in the discussion of the federal rule in Harris, the "flexible approach to Rule 13 problems attempts to analyze whether the essential facts of the various claims are so logically connected that considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit." Harris, 571 F.2d at 123. In light of the substantial differences in issues between the instant claim and the 1982 declaratory action, and the fact that appellants' present assertion of slander of title and attendant damages had not fully materialized in January 1984, considerations of fairness and judicial economy argue against a finding that the claim should have been raised in January 1984 or waived.[4]
In support of the trial court's ruling that appellants' action for malicious prosecution is barred, appellees rely upon Cate v. Oldham, 450 So.2d 224 (Fla. 1984) and Cypher v. Segal, 501 So.2d 112 (Fla. 4th DCA 1987). In Cate the supreme court held that a public official sued in his official capacity could not bring a suit for malicious prosecution. The court engaged in a historical analysis and concluded that such an action was barred in light of the potential chilling effect upon citizens' exercise of their right to petition the government for redress of grievances. In Cypher, the court addressed the right of a public official, sued in his private capacity, to seek damages for malicious prosecution in a subsequent suit. The Fourth District held that where Cypher, the plaintiff in the malicious prosecution action, had previously recovered costs at the conclusion of the earlier action brought against him, he was precluded from later suing for further damages for malicious prosecution. The Cypher court quoted the following language from Cate:
At common law successful defendants could either tax costs and fees in the original action, or they could sue for malicious prosecution upon the basis of those losses; they could not do both. Parker v. Langley, 93 Eng.Rep. at 297. There being no Florida decision or statute to the contrary, the common law rule *948 precludes such an attempt at double recovery here.
Cypher, 501 So.2d at 114.
We disagree with the Fourth District's interpretation of Cate. We do not read Cate to preclude appellants' subsequent suit for damages which could not have been recovered in the original action, such as compensation for harm to reputation. No double recovery is involved where a plaintiff brings a malicious prosecution action for damages which were not recovered in the original action. In Cate the court went on to state:
A government official sued only in his or her official capacity, and from whom no relief is sought which would run against his or her personal, as opposed to governmental behavior or finances, can claim no greater right to seek greater sanctions. He or she has personally suffered no loss which is not redressable through his or her application for redress in the suit in which he or she is originally sued. It is reasonable to compel such officials to seek such redress in the suit in which they are named defendants in their official capacity.
Id. at 227.
Election of remedies was not a factor in Cate, as the court held that the taxing of costs and fees in the original action was the public official's exclusive remedy. Additionally, while the court referred to the right to petition government for grievances against private parties, Cate at 225-226, the court in no way limited the right of a private party to sue for malicious prosecution. Requiring an election of remedies in the fashion of the Cypher court does not protect the right to petition, since the same remedies are available to a defendant who does not seek costs in the first action.
Additionally, we find that the trial court erred in ruling that the complaint failed to state a cause of action for tortious interference with contractual rights, tortious interference with an advantageous business relationship, and conspiracy. The court found that the complaint "fails to supply an essential element of the tort of interference, namely the absence of justification or privilege." The court further stated that appellees' legitimate interest in the well being of their community and the protection of their property rights grants them a privilege in their actions and statements.
A statement "made by one who has a duty or interest in the subject matter to one who has a corresponding duty or interest" is qualifiedly privileged. McCurdy v. Collis, 508 So.2d 380, 382 (Fla. 1st DCA 1987). In those circumstances in which there is a qualified privilege, the privilege carries with it the obligation to employ means that are not improper. Id. at 384; G.M. Brod & Company, Inc. v. U.S. Home Corporation, 759 F.2d 1526, 1535 (11th Cir.1985) The complaint alleges that appellees made numerous false statements to third parties, with full knowledge of the statements' falsity and with the purpose of harming appellants' economic interests. Accepting the allegations as true and reading them in the light most favorable to appellants as we are required to do, Cutler v. Board of Regents of State of Florida, 459 So.2d 413, 414 (Fla. 1st DCA 1984), the complaint makes a facially sufficient claim that any privilege was lost by appellees' use of improper means. Since appellants also alleged that appellees conspired to interfere with appellants' contractual rights and advantageous business relationship, it follows that the claim for conspiracy also states a sufficient claim.
Appellees argue, and the trial court apparently found, that appellants were obligated to meet some higher standard because all of appellees' actions were protected by the First Amendment of the United States Constitution. This rationale is based upon the contention that due to the authority which Turkey Creek exercised in its operation of the PUD, it should be considered a "quasi-governmental" entity. We reject this contention. All of the parties to this action are private entities. Since no state action is involved, constitutional considerations do not come into play. See Brook v. Watergate Mobile Home Park Associations, 502 So.2d 1380 (Fla. 4th DCA 1987).
*949 We therefore reverse and remand with directions to reinstate all counts. We acknowledge conflict with the holding of the Fourth District in Cypher, supra.
REVERSED.
SMITH and ALLEN, JJ., concur.
NOTES
[1] The facts are taken primarily from the allegations of the complaint, which, for purposes of this appeal, are accepted as true.
[2] The claims for slander of title and malicious prosecution were dismissed with prejudice in a November 1987 order which dismissed the remaining counts with leave to amend. An appeal from that order was dismissed as an unauthorized appeal from a non-final order. The trial court subsequently dismissed with prejudice the Second Amended Complaint which reasserted the remaining counts. We review both of these orders of dismissal in this appeal.
[3] Harris' complaint was based upon violation of federal statutes, while the counterclaim alleged only state law claims and therefore did not assert any independent basis for federal jurisdiction. After Harris' suit was dismissed, the trial court dismissed the counterclaim. This dismissal was upheld on appeal on the ground that the defamation action was a permissive rather than compulsory counterclaim.
[4] There are sound policy reasons for not treating potential counterclaims as compulsory where they are not logically related. Where the defendant has not yet determined whether to assert at the time of the original suit a separate cause of action against the plaintiff, the possibility remains that the defendant will ultimately choose not to assert his action at all, a result which obviously serves the goal of judicial economy.